JOHN J. KENNELLY *vs.* NEAL P. KELLY AND OTHERS.

*J* and *N* in 1871 owned blackacre in common and *J* owned whiteacre in severalty. At that time *J* borrowed $3,000 at a savings bank for which *J* and *N* gave their joint note and a mortgage, executed by them both, of blackacre and whiteacre—there being nothing to show that *N* signed the note for *J's* accommodation. In 1872 *J* sold whiteacre to B, with a covenant against incumbrances, the deed being duly recorded. In 1880 *J* went into insolvency, and his assignee, under an order of court, sold his interest in blackacre, and *K* purchased it. In 1882 *K*, not knowing that the savings bank loan had gone to *J* alone, paid the bank the full amount of the note and had it and the mortgage transferred by the bank to his son, the plaintiff. On a suit brought by the latter against *N* and *B* for a foreclosure of the mortgage, it was held—

1. That *K*, in paying the amount of the note to the savings bank, was not to be regarded as paying and extinguishing the note.
2. That the plaintiff's rights were precisely those of *K*, who advanced the money and had the transfer made to him.
3. That *K's* rights were two-fold and distinct, one as the holder of the mortgage, the other as the owner of the equity in half of blackacre.
4. That as holder of the mortgage he had all the rights of the savings bank, unaffected by later conveyances, except as he was the owner of a part of the equity, creating a case for apportionment.

5. That as the purchaser of *J's* interest in half of blackacre without knowledge of the secret equity of *N*, he took that interest subject only to the equity of *B*, which appeared of record, to have whiteacre saved from the payment of any part of the debt.

6. That while the obligation to save whiteacre from the debt was a personal one on the part of *J*, by reason of his covenant, there was no personal obligation on the part of *K*, but merely an equity affecting the land, which equity was that the whole of his interest in blackacre should be first applied in payment of the debt.

7. That if *K's* half of blackacre was sufficient to pay the debt, then the whole debt was paid so far as *B* was concerned and whiteacre was discharged. But in that case *K* would have the right to foreclose *N* unless he paid him the amount of half the debt.

8. That if *K's* half of blackacre was insufficient to pay the whole debt then the value of that half was to be applied as so much paid on the debt, and *K* would have the right to foreclose *N* unless he paid half the debt and to foreclose *B* unless he paid the balance of the debt beyond what his, *K's*, interest in blackacre had paid.

9. That if on such foreclosure *B* should be compelled to pay the balance resting on whiteacre, he would have equitable rights against *N's* half of blackacre, to be afterwards adjusted.

SUIT for a foreclosure of mortgaged premises; brought to the City Court of the city of Hartford and heard before *Bennett, J.* The following facts were found by the court.

On August 3d, 1871, John Kelly and Neal P. Kelly executed a joint and several note to the Chelsea Savings Bank of Norwich, Conn., for the sum of three thousand dollars, payable on demand with interest semi-annually in advance, and to secure the payment thereof they on the same day joined in executing a mortgage to the bank of the two pieces of land described in the complaint.

In the first piece each owned an undivided one-half interest. The second piece was owned by John Kelly alone, and is of greater value than the first piece. The mortgage was duly recorded.

John Kelly and Neal P. Kelly had a private agreement that Neal P. Kelly executed the note and mortgage wholly for the accommodation of John Kelly, who procured the loan from the bank for his own benefit and used the money received in his own business; and as between themselves John Kelly was to be liable for the payment of the whole principal sum.

On November 20th, 1872, the mortgage being in full force, John Kelly by warrantee deed conveyed the second piece of land to Bernard Kelly, covenanting that the same was free from all incumbrances whatsoever; which deed was duly recorded. This deed was given for a valuable consideration, and its form and covenants conform to the intentions of the grantor and grantee.

In October, 1873, Bernard Kelly died intestate, and the court of probate appointed Alice Kelly, his widow, administratrix of his estate. His interest in the second piece of land passed to his widow and his children, who are the present owners, and are made defendants in the suit.

On the 15th of March, 1880, Ferris W. Cady, as trustee upon the assigned estate of John Kelly, who had gone into insolvency, conveyed the interest formerly owned by John Kelly in the first piece of land to Mary Kennelly. This conveyance was in pursuance of a sale of the interest of John Kelly at public auction under an order of the court of probate, at which public sale the defendant James Kennelly was the purchaser, he being the highest bidder; but he caused the deed to be made to Mary Kennelly his wife. The sale and conveyance were made subject to the mortgage of $3,000 to the Chelsea Savings Bank.

On the 6th day of June, 1881, Mary Kennelly and James Kennelly her husband, by deed of that date, quitclaimed all their interest in the first piece of land to Edward B. Bennett, who on the same day quitclaimed the same to James Kennelly, who is the present owner.

On the 19th day of May, 1882, James Kennelly paid to the Chelsea Savings Bank the full amount due by the note and mortgage, and caused the bank to execute an assignment of the note and mortgage to John J. Kennelly, his son, the plaintiff, who is the present owner thereof. James Kennelly had no knowledge of the private agreement between John and Neal P. Kelly whereby Neal signed the note and mortgage wholly for the accommodation of John, until long subsequent to the assignment of them to the plaintiff.

James Kennelly and Neal P. Kelly are in possession of the first piece of land; and Alice Kelly, the widow, and the children of Bernard Kelly, are in possession of the second piece.

As a conclusion of law from these facts, the court found the issues for the widow and children of Bernard Kelly, and for the plaintiff against the defendants James Kennelly and Neal P. Kelly, and also found that there was due on the note the sum of $3,216.50, and passed a decree of foreclosure against the last named defendants.

The plaintiff and Neal P. Kelly severally appealed from the judgment.

*W. W. Perry*, for the plaintiff.

1. The Chelsea Savings Bank, if it still owned this mortgage and were plaintiff in this suit, would be entitled to a judgment of foreclosure against both pieces of land covered by the mortgage. A mortgagee's lien cannot be affected by equities between owners, and such equities cannot be settled in the original foreclosure suit, but raise a question of contribution to be subsequently determined. *Sanford* v. *Hill*, 46 Conn., 42. Under a system of foreclosure by sale, the original mortgagee, if plaintiff in this case, might be compelled to satisfy its claim out of the first piece, *if of sufficient value*. But that is impracticable under our system of strict foreclosure. Furthermore, the court did not find that the first piece was of sufficient value.

2. The plaintiff owns this mortgage and derived title thereto directly from the savings bank. He therefore succeeds to all the rights of the bank.

3. The claim made and sustained in the court below that James Kennelly had paid the mortgage debt as to the second piece and cleared it from the incumbrance, should have been overruled. 1st. Payment had not been pleaded; on the contrary, the answer filed by the defendants interested in the second piece treated the transaction as an assignment. 2d. Payment had not been proved, but simply an assignment of the mortgage directly from the bank to the plain·

tiff. The fact that the plaintiff's father furnished the money in consideration of which the assignment was made, is immaterial. Intention should control, and James Kennelly clearly did not intend to extinguish the mortgage debt. It may be urged that a court of equity should say that the transaction amounted to payment, though not so intended in fact, because James Kennelly was equitably bound to pay the whole mortgage debt and clear the second piece. He was under no such equitable obligation. The most that can be said is that, when he acquired an interest in the first piece, he took it with an equitable burden resting upon that piece of satisfying the mortgage debt to the extent of its value. John Kelly, by the covenants of his deed to Bernard Kelly, took upon himself a personal liability. He further devolved upon the land itself which remained unsold, an equitable burden which clung to it after it passed into other hands. But on what theory of equity can it be said that that equitable burden should, if the land could not bear it all, be thrust upon the shoulders of John Kelly's successors in title? All the cases which touch on this subject clearly recognize the limitation which prevents this equitable burden upon land from becoming a most inequitable burden upon the land owner. *Hunt* v. *Mansfield*, 31 Conn., 488; *Sanford* v. *Hill*, 46 id., 42. The defendants were bound to prove every point needed to make out the equity whose protection they sought. This all-important fact of the sufficiency of value of the first piece was not proved; it cannot be presumed; and the judgment is therefore erroneous.

4. Another phase of the claim made by the owners of the second piece is that, even if the plaintiff took title to the mortgage by the assignment, he took it, either in trust for his father, or by way of gift from his father, and therefore has no greater rights under it than his father would have had if it had been assigned to him. The measure of the father's rights has already been sufficiently discussed. If there was any gift, it was simply a gift of the money used to buy the mortgage. There was no resulting trust. The relationship of father and son between James Kennelly and

the plaintiff repels the presumption of a resulting trust, even if it were otherwise warranted. It is to be presumed that the money furnished by the father was an advancement. 2 Swift Dig., 128; *Finch* v. *Finch*, 15 Ves., 50; *Dyer* v. *Dyer*, 2 Cox, 92.

5. As to the rights of Neal P. Kelly. James Kennelly, at the time of his acquiring an interest in the first piece and at the time of the assignment of the mortgage to his son, had no actual notice of the fact that, as between John Kelly and Neal P. Kelly, makers of the mortgage note, Neal was simply a surety. The mortgage gave notice to the whole world that Neal was equally responsible with John upon the note. As against James Kennelly, therefore, Neal P. Kelly had no right to set up any equities growing out of his suretyship and no right to complain of any additional burden imposed by John Kelly's deed to Bernard Kelly. There is a Connecticut case which is decisive upon these points. *Orvis* v. *Newell*, 17 Conn., 97. James Kennelly, therefore, was under no equitable obligation to relieve Neal P. Kelly's interest from the burden of the mortgage by paying the mortgage debt. That he did not, in fact, pay it, has been sufficiently demonstrated in treating of the other branch of the case.

*H. S. Barbour* and *C. Lounsbury*, for Neal P. Kelly.

1. The mortgage debt has no longer any existence. The mortgage was made for John Kelly's benefit alone; it was his duty to pay the entire debt. James Kennelly having purchased John's interest in the equity of redemption, it became his duty to pay the whole debt or be barred of his equity. When James Kennelly paid the note, the mortgage debt was extinguished. The transaction was strictly a *payment* and not a *purchase*, and it was his duty to cause it to be discharged. Cady, trustee, sold to James Kennelly only such an interest as John Kelly had, to wit, an undivided half, subject to the *whole* debt. James therefore stands in John's shoes, and when he paid the debt, he did simply what he was obliged to do in order to redeem his property from

the mortgage.   His attempt to keep the mortgage alive by this assignment, was an attempt to perpetrate a fraud upon the rights of Neal P. Kelly, and the aid of a court of equity is invoked to assist him in the fraud.   *Champney* v. *Coope*, 34 Barb., 539; *Sanford* v. *Hill*, 46 Conn., 42; 1 Hilliard on Mortgages, 535, § 5.   Again, the Kennellys are chargeable with legal notice that the whole burden of this debt lay upon the share of John Kelly in the first piece.   The court, it is true, finds that James had no knowledge of the private agreement between John and Neal; but the recorded deed to Bernard Kelly showed that John had imposed the burden of the whole debt on his share.   *Hunt* v. *Mansfield*, 31 Conn., 488; *Sanford* v. *Hill*, 46 id., 42.   John Kelly's covenant to defend the title of the land conveyed, against all incumbrances, including the then existing mortgage, not only subjected *his land*, but created a *personal liability* against him for its payment, and if he failed to pay he would be liable on his covenants.   James Kennelly must be charged with knowledge of this liability, both when he purchased the equity and when he paid the note, as it was upon record. He must therefore be held to have assumed the same liability, at least to the extent of the value of his land, and having paid the note and discharged this liability, he can not now claim to be reimbursed by a party on whom no equitable liability rests.

2. But if the debt is not extinguished, the court erred in holding that Neal's share is now charged with its payment, and that he must pay it or lose his property.   When he signed the note it was secured upon both pieces of land, and without any fault or act of his the second piece is discharged of the mortgage, as the court has found, and a court of equity is asked to make complete the attempted fraud upon him.   The plaintiff paid no consideration for the note, and is not the *bonâ fide* holder of it.   *Bixby* v. *Parsons*, 49 Conn., 483.   If he has any title he holds it in trust for his father, who paid it, and can have no benefit from it.   The only effect is to extinguish the mortgage.   1 Jones on Mort., § 740; 1 Hilliard on Mort., 541, § 11; *Young* v. *Williams*, 17 Conn., 398.

*C. E. Gross*, for the heirs of Bernard Kelly.

So long as John Kelly continued to own the first piece of land, his interest therein was chargeable in equity with the duty of freeing the second piece from the mortgage, and with the payment of the mortgage debt. James Kennelly not only succeeded to John Kelly's interest in the land, but also to its equitable burden, and to the extent of that interest, in equity at least, he assumed John's debt. *Hunt* v. *Mansfield*, 31 Conn., 438. When, therefore, James Kennelly *voluntarily* paid John Kelly's legal debt under the mortgage deed to the savings bank, he at the same time paid John's equitable debt under the warranty deed to Bernard Kelly and his heirs. *Sanford* v. *Hill*, 46 Conn., 42. If the savings bank had brought a petition to foreclose its mortgage, James Kennelly would have been compelled to contribute toward freeing the second piece from the mortgage indebtedness to the full extent of the value of his interest in the first piece. What the value of that interest is does not appear, but certainly James Kennelly had a right to protect and save that interest, of the value of which he was the best judge, and to accomplish this he had a right to pay off not only its legal but also its equitable burdens. The payment of the debt, then, by the party obligated, operated to extinguish the debt, and the mortgage remains only a cloud on the title. The plaintiff can have no greater rights or equities than his father had. He is not an innocent purchaser, and takes, so far as he takes at all, only by way of gift from his father. But his father could not convey that which he had already extinguished, that is, the incumbrance on the second piece of land.

CARPENTER, J. On the third of March, 1871, John Kelly and Neal P. Kelly owned blackacre, and John Kelly owned whiteacre. On that day John Kelly borrowed $3,000 of the Chelsea Savings Bank, Neal P. Kelly signing with him and for his accommodation a note for that amount. That note was secured by a mortgage of blackacre and whiteacre, jointly executed by the owners. On the 20th of November,

1872, the note being unpaid, John Kelly sold whiteacre to Bernard Kelly, with covenants that the same was free from all incumbrances. In October, 1873, Bernard Kelly died intestate, whiteacre descending to his heirs. In March, 1880, Ferris W. Cady, assignee of the estate of John Kelly, an insolvent debtor, pursuant to an order of the court of probate, sold John Kelly's interest in blackacre to James Kennelly. In May, 1882, James Kennelly, not knowing that the money obtained from the savings bank was for the benefit of John Kelly alone, paid to the bank the full amount of the note, and caused the bank to transfer the same and assign the mortgage to his son, the plaintiff.

Upon these facts the court decreed a foreclosure against James Kennelly and Neal P. Kelly, the owners of blackacre, and dismissed the complaint against the heirs of Bernard Kelly, the owners of whiteacre. The plaintiff and Neal P. Kelly appealed.

As between John and Neal P. Kelly, it was John's debt. He was bound to pay it all; and if Neal P., or his property, was required to pay any part of it, he was bound to indemnify him. The whole burden of the security therefore, as between the makers of the note, in equity rested upon whiteacre and John's interest in blackacre. When John sold whiteacre, with covenants against incumbrances, he transferred that burden to his interest in blackacre; and if that was of sufficient value, Neal had a right to insist that it should pay the whole debt. The savings bank, however, was not bound by the equities existing between the makers. In addition to the obligation resting upon John to pay the whole debt as the real debtor, he had obligated himself to relieve whiteacre of the incumbrance by the covenants in his deed to Bernard. So far forth, therefore, as Neal P. and Bernard's heirs are concerned, the note was for John to pay. How did James Kennelly stand after he purchased John's interest in blackacre?

The claim that the whole debt rested on James Kennelly cannot be maintained; and for the reason that, when he purchased the equity of redemption, he purchased it as it

appeared of record, supposing that Neal was equally interested with John. He had no knowledge of the arrangement between them, he did not assume the mortgage debt, and did not otherwise assume any personal responsibility. The mere purchase of an equity of redemption assumes nothing, and risks nothing except the interest purchased. That being so, how did he stand after he purchased the mortgage note?

We cannot accede to the claim made in behalf of Neal P. Kelly, that it was a payment of the note, and operated to free all the land of the mortgage. As we have before said, when he purchased the equity of redemption he did not assume the mortgage debt or any personal responsibility. He stood in the shoes of John Kelly in respect to the land, but not in all respects as regards the debt. It is not the same, therefore, as it would have been if John Kelly had taken up the note, for it was not his debt personally, and it was Kelly's. John Kelly could pay his debt, but he could not purchase it. James Kennelly, as the case stood, could purchase an interest in the note.

It follows therefore, that the plaintiff acquired, and now holds, some rights in the mortgage debt; and that advances us another step in our inquiry. What are those rights? Obviously such rights only as his father would have had. What rights, then, did he acquire by paying or purchasing the note? And first, what right did he acquire against the heirs of Bernard Kelly? It is very clear that the bank would have had a right to a foreclosure against them, and so would any disinterested person purchasing the note in good faith. The conveyance to Bernard did not impair the security in respect to them. The plaintiff insists that James Kennelly stands upon the same high equitable grounds. We think not. This claim has already been partially answered; but we will consider it further. The claim ignores the fact that James Kennelly is an owner of the equity of redemption; and that as between himself and the other owners a portion of the debt in equity belongs to him to pay; and that portion as between himself and Bernard's heirs is exactly measured by the value of the one-half of blackacre, which he purchased subject to

the mortgage. If that is sufficient to pay the whole debt, then the debt is paid as to them, and they are discharged; if insufficient, then the debt is paid to the extent of that value, and as to the unpaid balance, James Kennelly is a purchaser. That is to say, he is bound to exhaust his interest in black-acre before he can touch whiteacre. And then he may resort to whiteacre. In this his position is different from that of John Kelly, had he paid or purchased the note. John Kelly could not have resorted to whiteacre at all, for two reasons: the whole debt was his to pay, and he had covenanted with Bernard Kelly to free whiteacre of the incumbrance; and therein exists the exemption which Bernard Kelly's heirs would have enjoyed. But James Kennelly was under no personal obligation to pay the debt, and he was no party to the covenant with Bernard Kelly, and was unaffected by it personally, although the land which he purchased was thereby charged with an additional burden.

We cannot treat the whole note as paid, for he was under no personal obligation to pay it all; it was not for his interest to do so, and manifestly he did not intend to do so. In the face of these facts the law will not presume that he paid it. Whiteacre is therefore holden for the balance of the note after deducting the value of Kennelly's interest in blackacre. Counsel for Bernard's heirs contend that white-acre is discharged on the authority of *Sanford* v. *Hill,* 46 Conn., 42. This case differs from that. There several pieces of land were mortgaged to secure one debt. The mortgagor sold one piece to Hill, covenanting that it was free from incumbrances. He subsequently sold another piece subject to the mortgage to Sanford. Afterwards the mortgagee foreclosed and Sanford redeemed. He then sued Hill for a contribution. The court held that he could not recover. But it appears in that case that the land pur-chased by Sanford was of sufficient value to pay the whole debt.

Secondly, what right did he acquire against Neal P. Kelly? When Neal signed the mortgage deed he charged his land with the payment of the whole debt. As we have

seen, he did so for the accommodation of John. While the creditor had a lien on it for the full amount, John, had he paid the debt, would have had no claim upon it. James Kennelly who paid the note stands in the shoes of John to this extent; he must submit so far as Bernard Kelly's heirs are concerned to have the whole of his land applied to the payment of the debt. But his relation to Neal is different. Neal is a maker of the note and primarily liable for the whole debt. Had he simply mortgaged his property to secure John's debt without being personally liable, then Kennelly could not have resorted to that security until his own land was exhausted; and if that was sufficient to pay the whole debt that would release the security furnished by Neal. But Neal did more. He signed the note and thereby became personally liable for the whole debt; so that when Kennelly bought or took up the note we must presume that he did so relying on the personal responsibility of Neal. He might be willing to redeem knowing that Neal was ultimately liable for the debt, after deducting the value of one half of blackacre, but without such liability the presumption is that he would not redeem unless it should appear that his own land is worth more than the incumbrance.

There is some embarrassment in determining to what extent the decree is erroneous, arising from the fact that it does not appear what the value of Kennelly's interest in blackacre is. If that value is equal to the full amount of the debt then the whole debt is paid as to Bernard Kelly's heirs, and the complaint as to them should be dismissed. But as Neal Kelly is a maker of the note and presumptively liable for one half the debt, we think in that case the plaintiff is entitled to a decree against him for that amount.

If that value does not exceed one half the debt, then the plaintiff is entitled to a decree for the balance against Neal P. Kelly and Bernard Kelly's heirs. If it exceeds one half the debt, and is less than the whole, then the plaintiff is entitled to a decree against Bernards' heirs for the balance, and against Neal P. Kelly for one half of the debt. If on

Kennelly *v.* Kelly.

the foreclosure Bernard Kelly's heirs shall be compelled to pay any portion of the debt, they will have equitable rights against Neal P. Kelly's half of blackacre, to be adjusted in the present or a future suit.

Thus it is clear that the decree requiring Neal P. Kelly to pay the full amount of the debt or be foreclosed, is erroneous; and, as injustice may have been done the plaintiff, and probably was, in dismissing the complaint against Bernard Kelly's heirs, that portion of the judgment also must be reversed, although it is possible that the court will ultimately come to the same result as to that part of the case, upon a more complete finding of the facts.

In this opinion the other judges concurred.